### CLAGGETT *et al. v.* METROPOLITAN NAT. BANK.

(*Supreme Court, Special Term, New York County.*    December 8, 1888.)

BANKS AND BANKING—STATE BANKS—CONVERSION INTO NATIONAL BANKS—LIABILITIES.

Laws N. Y. 1865, c. 97, § 2, provides that any state bank becoming a national bank
shall be deemed to have surrendered its charter on compliance "with the require-
ments of this act," but that it shall continue a body corporate for three years after-
wards, for the purpose of closing its concerns, "but not for the purpose of continu-
ing, under the laws of this state, the business for which it was established."    Sec-
tion 6 provides that, when authorized to commence business as a national bank, all
assets of the old bank shall vest, without any conveyance, in the national bank,
which, on returning the bills of the state bank to the banking department of the
state, may receive the stock pledged to secure the redemption of the same, and that
it shall be subjected to the same rules as the state banks with regard to the final
redemption of the circulating notes of "such state banks so converted into national
associations."    Section 8 provides that the act shall not be construed so as to re-
lease the national bank from any obligation incurred before becoming such associa-
tion.    *Held,* that the conversion of a state bank into a national bank did not consti-
tute such a "closing of the business" of the state bank that it could limit its liability
to redeem its circulating notes by proceedings under Laws 1859, c. 236, authorizing
state banks intending to close business to publish notice that any persons having any
of the circulating notes of the bank should present them for redemption within six
years, and, failing to do so, the bank would no longer be liable on such notes.

Action by Sumner E. Claggett and Charles T. Chickering, as administra-
tors of the estate of James H. Paine, against the Metropolitan National Bank,
to recover the amount of certain bank-bills issued by the Metropolitan Bank
while incorporated under the laws of the state, and before it became a national
bank.    On March 14, 1867, such bank deposited with the bank superintend-
ent of the state a sum of money equal to its outstanding circulation, and the
superintendent published notice that the circulating notes of such bank would
be redeemed at par at any time within six years from the date of notice, and
that all notes that were not presented for redemption within that time should
cease to be a charge upon the fund in the hands of the superintendent for that
purpose.    The bank-bills in suit were not presented for redemption within
seven years from the date of such notice.

*Theo. H. Swift,* (*Elihu Root,* of counsel,) for plaintiffs.    *Peabody, Baker
& Peabody,* (*Fisher A. Baker,* of counsel,) for defendant.

PATTERSON, J.    In this action is involved the applicability to the facts dis-
closed in the agreed statement of the provisions of chapter 236 of the Laws of
1859, as amended by chapter 348 of the Laws of 1866, and the provisions of
chapter 97 of the Laws of 1865; the latter being entitled:  "An act enabling
the banks of this state to become associations for the purpose of banking un-
der the laws of the United States."

The defendant claims exemption from liability for the bank-notes found
among the effects of the plaintiffs' intestate on the ground that all liability
therefor ceased long before this action was brought because of the deposit of
money with the state superintendent of banking, the publication of notice re-
quiring redemption of the notes to be made within six years, and the failure
to present such notes for redemption pursuant to the notice.    The act of 1859
was passed to facilitate the winding up of the affairs and business of state
banks intending to close business, or whose charters had expired, or which
had become insolvent, and it was not intended to affect banks whose business
was to go on continuously.    If the Metropolitan Bank did close business by
becoming a national banking association, the contention here made would be
unanswerable; but merely by changing from the state to the federal system
of banking it did not close its business.

It was held by the court of appeals in *Bank* v. *Phelps*, 97 N. Y. 44, that "the general scheme of the national banking act is that state banks may avail themselves of its privileges, and subject themselves to its liabilities, without abandoning their corporate existence, without any change in the organization, officers, stockholders, or property, and without interruption of their pending business or contracts. All property and rights which they held before organizing as national banks are continued to be vested in them under their new *status;*" and, "although in form their property and rights as state banks purport to be transferred to them in their new *status* of national banks, yet, in substance, there is no actual transfer from one body to another, but a continuation of the same body under a changed jurisdiction. As between it and those who have contracted with it, it retains its identity, notwithstanding its acceptance of the privilege of organizing under the national banking act." When that case was decided in this court, GILBERT, J., whose view is indorsed by the court of appeals, said, (16 Hun, 158:) "The change from a state to a national bank did not destroy either the existence or the identity of the corporation. Such change conferred new franchises, and imposed new duties and liabilities, on the corporate body in addition to those which it previously had, but nothing more. There was a slight change in the corporate name, but the new name designated the same entity. In short, the legal effect of the change was merely the acceptance of a new charter by the corporation. It remained to every intent and purpose as it did before, though its name was altered, and its new charter was granted by the national instead of the state legislature."

The necessary result of this view of the law is that the change or conversion of the Metropolitan Bank to the Metropolitan National Bank did not result in a close of its business. It remained the same bank, and went on doing business continuously; and a mere passing of a resolution that it intended to close business could not have the effect now claimed, as the intention manifestly was simply to prosecute its then "pending business," and to conduct business thereafter under the changed jurisdiction. If this is correct, the proceedings under the act of 1859 were ineffectual, unless they were authorized under the provisions of chapter 97 of the Laws of 1865. By section 2 of that statute it is enacted that any state bank becoming a national banking association "shall be deemed to have surrendered its charter, if it shall have complied with the requirements of this act, provided that every such bank shall nevertheless be continued a body corporate for the term of three years after the time of such surrender, for the purpose of prosecuting and defending suits by and against it, and of enabling it to close its concerns, and to dispose of and convey its property; but not for the purpose of continuing, under the laws of this state, the business for which it was established."

It is claimed that, under the section referred to, the Metropolitan Bank was authorized to close its business, and was brought within the permission of the act of 1859 as to terminating liability on its circulating notes as a bank closing business, and one whose charter had expired. The surrender of the charter may be deemed an expiration; but an examination of the other provisions of the act of 1865 will show that it was not the intention of the legislature to confer authority on the state institution to extinguish the liability of the national banking association into which it was converted for its circulating notes. By section 8 it is provided that "nothing in this act shall be construed as releasing such association from its obligations to pay and discharge all the liabilities created by law, or incurred by the bank before becoming such association." Beyond that, the general purpose of maintaining the liability of the national banking association for the circulating notes of the state bank is indicated in the sixth section, which provides that, as soon as the certificate of the comptroller of the currency has been obtained, authorizing the bank to commence business, etc., "all the assets, real and personal, shall immediately, and by act of law, and without any conveyance or transfer, be vested in and

become the property of the national banking association into which such bank shall have been converted." It is not suggested that the correlative duty of paying the liabilities was not assumed by taking over the assets. As clearly indicating the purpose of the legislature, the same section 6 proceeds to enact: "And it [the national bank] shall be entitled, on returning the bills of such [the state bank] to the banking department of this state, to receive the stocks pledged to secure the redemption of the same, in like manner as the bank issuing the same is now entitled by law, and shall be subjected to the same rules as such banks in respect to the final redemption of the circulating notes of such state banks so converted into national associations."

One purpose of this act seems clearly to have been to carry with the transfer of the assets the obligation to pay all liabilities of the state bank, including the circulating notes, and to put at the disposal of the national bank the securities lodged with the banking department to protect the circulation, and to continue down to final redemption the duty of the national bank to pay that circulation. Such a purpose is inconsistent with the theory of the legislature having conferred on the state organization the right to destroy the liability of the national bank, and renders the act of 1859 inapplicable; and while the state may not legislate concerning national banks so as to fix upon them liabilities or duties which congress has not seen fit to impose, it had power to declare how, and under what circumstances and conditions, the national banks might acquire funds or securities specifically pledged with the state for special contracts, under the state banking law, so long as that legislation did nothing further.

I am of the opinion that the bank-bills are a debt of the defendant, and that the plaintiffs are entitled to recover; bank-bills not being within the statute of limitations by the law of this state.